# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **TERESA R. ATKINS** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 15-1168-JWL** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Acting Commissioner of Social Security (hereinafter Commissioner) denying Disability Insurance benefits (DIB) and Supplemental Security Income benefits (SSI) under sections 216(i), 223, 1602, and 1614(a)(3)(A) of the Social Security Act. 42 U.S.C. §§ 416(i), 423, 1381a, and 1382c(a)(3)(A) (hereinafter the Act). Finding no error in the Administrative Law Judge's (ALJ) decision, the court ORDERS that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the final decision of the Commissioner.

## I.   Background

Plaintiff applied for DIB and SSI benefits, alleging disability beginning March 23, 2010. (R. 11, 182, 191). Plaintiff exhausted proceedings before the Commissioner, and now seeks judicial review of the final decision denying benefits. She argues that the ALJ

erred in his credibility determination and in deciding that her condition does not meet the criteria of Listing 1.04A.

The court's review is guided by the Act.  Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009).  The Act provides that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  The court must determine whether the ALJ's factual findings are supported by substantial evidence and whether he applied the correct legal standard.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001).  Substantial evidence is more than a scintilla, but less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971); see also, Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).

The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency."  Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005).  Nonetheless, the determination whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.  Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner uses the familiar five-step sequential process to evaluate a claim for disability.  20 C.F.R. §§ 404.1520, 416.920; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether she has a severe impairment(s), and whether the severity of her impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1).  Williams, 844 F.2d at 750-51.  After evaluating step three, the Commissioner assesses claimant's residual functional capacity (RFC).  20 C.F.R. §§ 404.1520(e); 416.920(e).  This assessment is used at both step four and step five of the process.  Id.

The Commissioner next evaluates steps four and five of the sequential process-- determining at step four whether, in light of the RFC assessed, claimant can perform her past relevant work; and at step five whether, when also considering the vocational factors of age, education, and work experience, claimant is able to perform other work in the economy.  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In steps one through four the burden is on Plaintiff to prove a disability that prevents performance of past relevant work.  Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord, Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2. At step five, the burden shifts to the Commissioner to show that there are jobs in the

3

economy which are within the RFC assessed.  Id.; Haddock v. Apfel, 196 F.3d 1084,

1088 (10th Cir. 1999).  The court addresses each issue in the order presented in Plaintiff's

Brief and finds no error.

**II.      The ALJ Did Not Err in His Credibility Determination**

Plaintiff claims the ALJ erred in his credibility determination because he relied

upon a "single Waddell sign" and on Dr. Stein's report of "signs of symptom

magnification and overreaction."  (Pl. Br. 4-7).  She argues that authorities in both the

legal and the medical fields have expressed skepticism at using Waddell signs in

determining malingering for disability purposes.  Id. at 5-6 (citing Minor v. Comm'r of

Soc. Sec., 513 F. App'x 417, 422 n.15 (6th Cir. 2013); and Gordon Waddell et al.,

Nonorganic Physical Signs in Low-Back Pain, 5 Spine 117, 118 (Mar.-Apr. 1980)).  She

argues that Waddell signs are merely an indication of pain of nonorganic origin and do

not necessarily establish malingering because there may be a psychological component to

the pain.  Id. at 5 (citing Wall, 561 F.3d at 1056 n.10).  She argues that a single Waddell

sign "is insufficient to allow the ALJ to draw a conclusion that Atkins was malingering."

Id.

As to Dr. Stein's report, Plaintiff argues that there is a lack of other evidence

supporting the ALJ's credibility determination, and that the evidentiary context suggests

Dr. Stein's report of symptom magnification and overreaction should not be credited.  Id.,

at 6-7.  This is so in Plaintiff's view because despite Dr. Stein's report, Plaintiff had back

surgery just two months later in an attempt to relieve her symptoms.  Id., at 7.

Additionally, Plaintiff notes that about a year later Dr. Fuller examined Plaintiff and reported that Plaintiff almost jumped off the table in pain in response to external rotation of her left hip, but Dr. Fuller did not comment that this was an overreaction or otherwise inappropriate response.  (Pl. Br. 7).  Plaintiff acknowledges that it was Dr. Fuller's finding of positive Waddell's signs upon which the ALJ relied, but argues as discussed above that "Dr. Fuller's finding of only two of the five Waddell's signs is insufficient to draw a conclusion about malingering or symptom magnification."  Id. (citing R. 523). She asserts that "any conclusion that [Ms.] Atkins was less than honest about the severity of her symptoms is not supported by substantial evidence."  Id.

The Commissioner argues that the ALJ reasonably concluded that Plaintiff's allegations of symptoms were not fully credible.  (Comm'r Br. 7).  She argues that healthcare providers' observations of Waddell's signs, and belief regarding symptom magnification "is highly relevant to a credibility analysis."  Id. (citing Gossett, 862 F.2d at 807); Diaz v. Sec'y of Health and Human Servs., 898 F.2d 774, 777 (10th Cir. 1990); and Wall, 561 F.3d at 1069-70.  She argues that although positive Waddell's signs might be indicative of something other than malingering it was reasonable to consider such signs in conjunction with Dr. Stein's observation of symptom magnification and overreaction in weighing credibility.  Id. at 8-9.  She argues the fact that Plaintiff had surgery two months later is irrelevant to Dr. Stein's opinion regarding symptom magnification because Dr. Stein recognized that surgery might be appropriate in the circumstances but still determined that Plaintiff overreacted and magnified her symptoms.

Id. at 9.  Finally, the Commissioner argues that the ALJ provided numerous reasons in addition to positive Waddell's signs and symptom magnification to support his credibility determination.  (Comm'r Br. 9-11).  The court agrees with the Commissioner.

### A.   Standard for Evaluating Credibility

The framework for a proper credibility analysis is set out in Luna v. Bowen, 834 F.2d 161 (10th Cir. 1987).  An ALJ must consider (1) whether the claimant has established a symptom-producing impairment by objective medical evidence; (2) if so, whether there is a "loose nexus" between the proven impairment and the claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, the claimant's symptoms are in fact disabling.  See, Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993) (explaining the Luna framework).  The Commissioner has promulgated regulations suggesting relevant factors to be considered in evaluating credibility:  Daily activities; location, duration, frequency, and intensity of symptoms; factors precipitating and aggravating symptoms; type, dosage, effectiveness, and side effects of medications taken to relieve symptoms; treatment for symptoms; measures plaintiff has taken to relieve symptoms; and other factors concerning limitations or restrictions resulting from symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i-vii), 416.929(c)(3)(i-vii).  The court has recognized a non-exhaustive list of factors which overlaps and expands upon the factors promulgated by the Commissioner.  Luna, 834 F.2d at 165-66.  These factors include:

the levels of medication and their effectiveness, the extensiveness of the
attempts (medical or nonmedical) to obtain relief, the frequency of medical
contacts, the nature of daily activities, subjective measures of credibility
that are peculiarly within the judgment of the ALJ, the motivation of and
relationship between the claimant and other witnesses, and the consistency
or compatibility of nonmedical testimony with objective medical evidence.

Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995) (quoting Thompson, 987 F.2d at

1489).

The court's review of an ALJ's credibility determination is deferential.  Credibility

determinations are generally treated as binding on review.  Talley v. Sullivan, 908 F.2d

585, 587 (10th Cir. 1990); Broadbent v. Harris, 698 F.2d 407, 413 (10th Cir. 1983).

"Credibility determinations are peculiarly the province of the finder of fact" and will not

be overturned when supported by substantial evidence.  Wilson, 602 F.3d at 1144; accord

Hackett, 395 F.3d at 1173.  "However, '[f]indings as to credibility should be closely and

affirmatively linked to substantial evidence and not just a conclusion in the guise of

findings.'"  Wilson, 602 F.3d at 1144 (quoting Huston v. Bowen, 838 F.2d 1125, 1132

n.7 (10th Cir. 1988); Hackett, 395 F.3d at 1173 (same).

**B.**    **Analysis**

The ALJ applied the correct legal standard as outlined above in evaluating the

credibility of Plaintiff's allegations of symptoms.  (R. 14-17).  Plaintiff does not argue

otherwise.  Rather, she argues that the ALJ's rationale in finding Plaintiff's allegations

"not entirely credible" is not supported by substantial evidence and the reasons relied

upon by the ALJ are overwhelmed by other record evidence.  (Pl. Br. 4-7).  But, the only

"other" evidence she points to is evidence regarding her back surgery, Dr. Stein's examination report, Dr. Fuller's treatment notes, and her argument that Waddell's signs might signify something other than malingering.  As the Commissioner argues, Plaintiff says nothing whatever regarding the ALJ's other bases for discounting her credibility--her August 2010 suggestion that she was ready to return to work, repeated MRIs through February 2011 showing only mild to moderate findings, evidence that her May 2011 back surgery was successful, her generally normal examination results, and her reported activities of daily living.  (R. 15-17) (citing Exs. 4E/9-11; 2F/8, 4F/10, 28; 7F/28, 62; 10F/6-7, 26; 11F/5; 12F/5; 16F/6; R. 269-71, 359-60, 389, 406-07, 461, 495, 523-24, 543, 558, 572-73, 586).

Moreover, the evidence on which Plaintiff relies does not demonstrate error in the ALJ's credibility determination.  As the Commissioner suggests, Dr. Stein recognized that Plaintiff's physical condition required surgery, but he also recognized that her emotional state including overreaction and symptom magnification was "not conducive to good recovery."  (R. 414).  He opined that further conservative management would not be helpful, and he concluded, "There are, in my opinion, two options at this time; 1.  Proceed with surgery . . . based on the presence of pathology.  2.  Consider further evaluation regarding symptom magnification prior to making a decision about surgery."  Id. Therefore, Plaintiff's argument that she had surgery two months later does not tend to discount Dr. Stein's opinion regarding symptom magnification and overreaction. Plaintiff's argument regarding Dr. Fuller's examination is no more helpful to her cause.

Plaintiff is correct that Dr. Fuller recorded when he examined Plaintiff's left hip, "[s]he almost jumps off the table in pain," and he did not specifically comment that she overreacted or acted inappropriately to that examination.  (R. 523).  However, Plaintiff ignores that it was just before that where Dr. Fuller recorded in the very same treatment note that "Waddell's test was positive overreaction to stimulus present, and regional weakness present."  Id.  And, it was that treatment note to which the ALJ cited when he found as one basis for his credibility finding that Plaintiff "demonstrated a positive Waddell's sign of overreaction to stimulus, and she almost jumped off the table in pain with hip range of motion during the April examination."  (R. 16) (emphasis added) (citing Ex. 10F/6; R. 523).  Both Dr. Stein' report and Dr. Fuller's examination note support the ALJ's finding that Plaintiff overreacted or exaggerated her symptoms.

As Plaintiff's Brief suggests, positive Waddell's signs do not necessarily establish malingering.  And, in isolation the court might be skeptical of such a basis to discount a claimant's allegations.  However, in this case they do not appear in isolation.  The ALJ also relied upon other evidence, and Plaintiff does not even address that evidence.  Giving the ALJ's credibility determination the deference it is due, the court finds no error.

**III.    Listing 1.04**

Plaintiff claims the ALJ erred in finding that Plaintiff's condition does not meet Listing 1.04--with evidence of nerve root compression.  She claims that her condition meets Listing 1.04A because the record shows that each of the criteria of that Listing are evidenced although never simultaneously, but that fact "should not preclude a claimant

from meeting or equaling a Listing." (Pl. Br. 9). She argues that the record shows neuro-anatomic distribution of pain in the lower back, left buttock, and down the left leg; limitation of motion of the spine, with lumbar flexion limited to 60 degrees forward and 25 degrees left or right; motor loss demonstrated by "what may be give-way weakness of the anterior tibialis and toe extensors in the left leg," "possible weakness of the L5 innervated muscles on the left," and strength of only 4 out of 5 associated with pain in the left anterior tibialis; and sensory or reflex loss demonstrated by "some hypesthesia to pinprick sensation in the left foot," and left ankle reflex mildly decreased compared to the right. (Pl. Br. 10). She points to occasions where the record documents positive straight-leg raising test on the left. Id. at 11.

Plaintiff argues that the ALJ inadequately explained his reasons to find the Listing is not met, folded that rationale into his credibility findings, and thereby forces the court to piece together the rationale and effectively leaves the rationale beyond meaningful judicial review. Id. at 11-12. She argues that because the ALJ's rationale supporting his step three finding is intermixed with the credibility determination it is impossible for the court to determine whether the step three finding was based on medical evidence alone as the regulations require, and the court "cannot determine [if] the ALJ's findings and the medical evidence of record 'conclusively negate the possibility . . . that [Plaintiff] is presumptively disabled under' Listing 1.04." Id., at 13 (quoting Fischer-Ross v. Barnhart, 431 F.3d 729, 735 (10th Cir. 2005)). Finally, relying upon a Fourth Circuit Court of Appeals case, Radford v. Colvin, 734 F.3d 288 (4th Cir. 2013), Plaintiff argues that

10

Listing 1.04A requires only that a claimant show that she met each of the specific criteria of nerve root compression at some point throughout the pendency of her claim but not simultaneously, and that she show that she has suffered or can be expected to suffer from nerve root compression continuously for at least 12 months.  (Pl. Br. 14) (citing Radford, 734 F.3d at 291-94).  Plaintiff recognizes that the opinion in Radford is not binding on this court, but argues that it is persuasive, and that accordingly this case should be remanded for the Commissioner to properly consider the Listing and the record evidence. Id. at 15.

The Commissioner argues that the ALJ reasonably found that Plaintiff's condition does not meet or medically equal the severity of Listing 1.04A.  She argues that Plaintiff's reliance on the Fourth Circuit's analysis in Radford is misplaced because the Tenth Circuit has never applied that analysis or indicated that the criteria of Listing 1.04 ("or any other Listing") need not be present simultaneously.  (Comm'r Br. 4).  She argues that "it appears that the only Tenth Circuit decision to address whether the medical criteria must be simultaneously present found that such simultaneity was required."  Id. at 4 (emphasis in original) (citing Melendez v. Astrue, 359 F. App'x 8, 11 (10th Cir. 2009).  She points out that after the Radford decision she published an Acquiescence Ruling explaining that the court's interpretation of the Listing conflicts with the agency's interpretation and that she would apply the court's interpretation only within the area of the Fourth Circuit.  (Comm'r Br. 4) (citing Soc. Sec. Acquiescence Ruling (AR) 15-1(4),

Radford v. Colvin:  Standard for Meeting the Listing for Disorders of the Spine with

Evidence of Nerve Root Compression, 80 Fed. Reg. 57,418-02 (Sept. 23, 2015)).

The Commissioner quotes extensively from AR 15-1, and explains her policy "that

listing 1.04A specifies a level of severity that is only met when all of the medical criteria

listed in paragraph A are simultaneously present."  Id. (quoting 80 Fed. Reg. at 57,420).

She expresses her view that when all of the criteria are present in an examination "the

individual has the clinical presentation we expect from a person who suffers from nerve

root compression that is so severe that it would preclude any gainful activity," but that

"[a]n individual who shows only some of the criteria on examination presents a different,

less severe clinical picture than someone with the full set of criteria present

simultaneously."  Id., at 4-5 (quoting 80 Fed. Reg. at 57,420).  She argues that the court

should accept AR 15-1 and accord it appropriate deference.  Id., at 6.

She argues that the ALJ's step three finding is supported by substantial record

evidence including the medical opinions of Dr. Cylus and Dr. Coleman, and Plaintiff did

not claim error in the ALJ's determination to accord significant weight to these opinions.

Id.  Finally, she asserts that any error in the ALJ's discussion at step three was harmless

"because the 'ALJ's findings at other steps of the sequential process . . . provides a proper

basis for upholding a step three conclusion that a claimant's impairments do not meet or

equal any listed impairment.'"  Id., at 6-7 (quoting Fischer-Ross, 431 F.3d at 733).

The parties' step three arguments can be distilled into two issues which the court

will address sequentially.  1.  Can Listing 1.04A be met if the record contains evidence of

each of the required criteria, but all of the criteria never appear simultaneously?

2.  Applying the correct legal standard regarding Listing 1.04A at step three, did the ALJ in this case adequately explain why Listing 1.04A is not met or equaled?

### A.      Step Three Standard

If a claimant's condition meets or equals the severity of an impairment in the Listing of Impairments, Pt. 404, Subpt. P, App. 1, that impairment is conclusively presumed disabling.  Williams, 844 F.2d at 751; see Bowen v. Yuckert, 482 U.S. 137, 141 (1987) (if claimant's impairment "meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled").  However, the claimant "has the burden at step three of demonstrating, through medical evidence, that h[er] impairments 'meet all of the specified medical criteria' contained in a particular listing."  Riddle v. Halter, No. 00-7043, 2001 WL 282344 at *1 (10th Cir. Mar. 22, 2001) (quoting Sullivan v. Zebley, 493 U.S. 521, 530 (1990) (emphasis in Zebley)).  "An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify" to meet or equal the listing.  Zebley, 493 U.S. at 530.

"The [Commissioner] explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard.  The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just 'substantial gainful activity.'" Zebley, 493 U.S. at 532-33 (emphasis in original) (citing 20 C.F.R. § 416.925(a) (1989)). The listings "streamlin[e] the decision process by identifying those claimants whose

medical impairments are so severe that it is likely they would be found disabled

regardless of their vocational background." Yuckert, 482 U.S. at 153.  "Because the

Listings, if met, operate to cut off further detailed inquiry, they should not be read

expansively."  Caviness v. Apfel, 4 F. Supp. 2d 813, 818 (S.D. Ind. 1998).

**B.**     **Listing 1.04A Standard**

Listing 1.04 regards disorders of the spine, with either (A) "evidence of nerve root

compression," (B) "spinal arachnoiditis," or (C) "lumbar spinal stenosis, resulting in

pseudoclaudication."  Listings 1.04B and 1.04C are not implicated here because the

record contains no evidence of spinal arachnoiditis or pseudoclaudication.  The relevant

Listing provides:

> 1.04  Disorders of the spine (e.g., herniated nucleus pulposus, spinal
> arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet
> arthritis, vertebral fracture) resulting in compromise of a nerve root
> (including the cauda equina) or the spinal cord.
>
> With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic
> distribution of pain, limitation of motion of the spine, motor loss (atrophy
> with associated muscle weakness or muscle weakness) accompanied by
> sensory or reflex loss and, if there is involvement of the lower back,
> positive straight-leg raising test (sitting and supine);

20 C.F.R., Pt. 404, Subpt. P, App. 1 §1.04.

As the quotation above reveals, the criteria of Listing 1.04A (one of the listed

disorders causing compromise of a nerve root or the spinal cord, and with nerve root

compression) are:  (1) neuro-anatomic distribution of pain, (2) limitation of motion of the

spine, (3) motor loss accompanied by either (a) sensory loss, or (b) reflex loss, and (only if the lower back is involved) (4) positive straight-leg raising, while both (a) sitting and (b) supine.

### C.   Listing 1.04A cannot be met if the record does not contain evidence that the Listing criteria appear simultaneously

In <u>Sullivan v. Zebley</u>, the Supreme Court addressed the statutory and regulatory scheme controlling the Commissioner's application of step three of the sequential evaluation process.  493 U.S. 521 (1990).  Prior to <u>Zebley</u>, the Social Security Administration (SSA) had determined that in deciding childhood disability cases, it would apply an abbreviated version of the sequential evaluation process and would award benefits only if the child was not doing any substantial gainful activity, if his impairment met the duration requirement, and if his impairment met or equaled a Listed Impairment. <u>Id.</u>, 493 U.S. at 526.  But, in establishing the Supplemental Security Income Program Congress passed a statute requiring that a child will be "considered to be disabled 'if he suffers from any . . . impairment of comparable severity' to one that would render an adult 'unable to engage in any substantial gainful activity.'" <u>Id.</u> at 529 (quoting 42 U.S.C. § 1382c(a)(3)(A) (1982 ed.).

<u>Zebley</u> was a class action suit in which the plaintiffs alleged that denial of benefits merely because a child's impairment did not meet or equal a Listed Impairment was statutorily impermissible because it was based on a narrower grounds than the statutory standard of comparable severity to an impairment which would render an adult disabled.

15

Id. at 526-27.  The Court analyzed the structure and text of the regulations controlling application of step three of the sequential evaluation process, and determined that the SSA's application of the Listing of Impairments at step three is purposefully more restrictive in several ways than the statutory standard for disability.  Id. at 529-34.  The Court noted that the shortcomings of the Listings to conclusively identify disability at step three are remedied for adults in the vocational steps of the sequential evaluation process, steps four and five, but that there was no similar opportunity for such individualized consideration of those children's impairments which are not so severe as a Listed Impairment but are nonetheless disabling.  Id., 493 U.S. at 534-36.  It concluded that "[t]he child-disability regulations are simply inconsistent with the statutory standard of 'comparable severity.'"  Id. at 536.  Ultimately, the Court affirmed the Third Circuit's determination to remand to the district court with directions to enter summary judgment in favor of the plaintiff class, and holding that the agency must give child claimants individualized assessment of their functional limitations.  Id. at 541.

Although the Supreme Court struck the SSA's application of step three as conclusive in child-disability determinations, its opinion left standing step three as a part of the agency's sequential evaluation process in deciding disability in adults.  In its consideration of the structure and text of the regulations implementing step three of the process for adults, the Court recognized several salient factors relevant to the court's consideration here.  (A) In order to meet a listing, a claimant must show that her condition meets "all of the specified medical criteria" of that Listing.  Id. at 530.  (B) The Listing's

16

purpose is to streamline the disability determination process by identifying those adults

whose disability clearly exceeds the statutory requirements:

> The [Commissioner] explicitly has set the medical criteria defining the
> listed impairments at a higher level of severity than the statutory standard.
> The listings define impairments that would prevent an adult, regardless of
> his age, education, or work experience, from performing any gainful
> activity, not just "substantial gainful activity." See 20 CFR § 416.925(a)
> (1989) (purpose of listings is to describe impairments "severe enough to
> prevent a person from doing any gainful activity"); SSR 83–19, at 90
> (listings define "medical conditions which ordinarily prevent an individual
> from engaging in any gainful activity"). The reason for this difference
> between the listings' level of severity and the statutory standard is that, for
> adults, the listings were designed to operate as a presumption of disability
> that makes further inquiry unnecessary. That is, if an adult is not actually
> working and his impairment matches or is equivalent to a listed impairment,
> he is presumed unable to work and is awarded benefits without a
> determination whether he actually can perform his own prior work or other
> work. See Yuckert, 482 U.S., at 141, 107 S.Ct., at 2291 (if an adult's
> impairment "meets or equals one of the listed impairments, the claimant is
> conclusively presumed to be disabled. If the impairment is not one that is
> conclusively presumed to be disabling, the evaluation proceeds to the fourth
> step"); id., at 153, 107 S.Ct., at 2297 (the listings "streamlin[e] the decision
> process by identifying those claimants whose medical impairments are so
> severe that it is likely they would be found disabled regardless of their
> vocational background"); Bowen v. City of New York, 476 U.S. 467, 471,
> 106 S.Ct. 2022, 2025, 90 L.Ed.2d 462 (1986) ("If a claimant's condition
> meets or equals the listed impairments, he is conclusively presumed to be
> disabled and entitled to benefits"; if not, "the process moves to the fourth
> step"); [Heckler v.] Campbell, 461 U.S. [458,] 460, 103 S.Ct. [1952,] 1953
> [76 L.Ed.2d 66 (1983)] ("The regulations recognize that certain
> impairments are so severe that they prevent a person from pursuing any
> gainful work.... A claimant who establishes that he suffers from one of
> these impairments will be considered disabled without further inquiry.... If
> a claimant suffers from a less severe impairment, the [Commissioner] must
> determine whether the claimant retains the ability to [work]").

Zebley, 493 U.S. at 532-33. (C) The Listings are more restrictive than the statutory

disability standard because (1) they "do not cover all illnesses and abnormalities that

17

actually can be disabling," because (2) the "medical conditions that are covered in the listings are defined by criteria setting a higher level of severity than the statutory standard, so they exclude claimants who have listed impairments in a form severe enough to preclude substantial gainful activity, but not quite severe enough to meet the listings level—that which would preclude any gainful activity," and because (3) the listings do not apply to impairments which would disable a particular claimant but do not disable all claimants.  Id. at 533-34 (emphases in original).

Viewed in light of Zebley's evaluation of the purpose and structure of the Listings at step three, the Commissioner's analysis in AR 15-1(4) explains how Listing 1.04A fits into that structure.  The Commissioner's explanation recognizes that certain disorders of the spine which result in compromise of the nerve root (one impairment satisfying the capsule definition of Listing 1.04) will produce impairments which will prevent all adults from performing any gainful activity, whereas there are other disorders of the spine resulting in compromise of the nerve root which may prevent some, but not all, adults from performing substantial gainful and will be disabling only to those individuals.

The Commissioner has found that line is clearly crossed at the point where all of the criteria of Listing 1.04A are present on examination simultaneously.  80 Fed. Reg. 57,420 ("When this set of criteria is present on examination, the individual has the clinical presentation we expect from a person who suffers from nerve root compression that is so severe that it would preclude any gainful activity." (emphasis added)).  She has found that where all of the criteria may be present in the record evidence, not

18

simultaneously, but in different examinations at different times, the line has not been

crossed, and further evaluation including individualized RFC assessment and application

of steps four and five of the sequential evaluation process are necessary to determine

whether that claimant is in fact disabled.  Id. at 57,420 ("An individual who shows only

some of the criteria on examination presents a different, less severe clinical picture than

someone with the full set of criteria present simultaneously.") (emphasis added).

Plaintiff does not present evidence, medical or otherwise, suggesting that the

Commissioner has drawn the line in the wrong place.  Rather, she argues that the lack of

the simultaneous presence of all of the criteria "should not preclude a claimant from

meeting or equaling a Listing" (Pl. Br. 9), "that neurological signs of lumbar nerve

compression are often intermittent" id. at 13 (citing Stephane Genevay & Steven Atlas,

Lumbar Spinal Stenosis, 73-2 Best Practice and Research Clinical Rheumatology 253-65

(April 2010), and that the regulations do not state that all of the requirements must be

present simultaneously.  Id. at 14-15 (citing Radford, 734 F.3d at 291-93).

Plaintiff's argument that the failure of simultaneous presence of all criteria should

not preclude a finding that she meets a Listing provides no citation beyond Radford--

which will be discussed later--and provides no explanation why her position on the issue

should be preferred to that of the Commissioner.  Moreover, her citation to Genevay &

Atlas tends to support the Commissioner's argument more than hers, and runs counter to

the purpose of the Listing of Impairments as found in Zebley.  If the neurological signs of

lumbar nerve compression (and perhaps nerve root compression)[1] are often intermittent, then a finding that the individual meets the criteria of the Listing whenever all of the criteria are evidenced in the record even where they are not simultaneous, would tend to broaden the Listing and defeat the purpose of the Listings to streamline the disability determination process and to identify and eliminate early in the process those claimants who cannot perform any gainful activity.  Finally, the Radford decision is not binding on this court, and it does not change the court's analysis.

Mr. Radford worked as a tree trimmer and he sustained an injury to his back while lifting part of a tree.  Radford, 734 F.3d at 291.  Over the next five years he was examined by several doctors who observed different symptoms of nerve root compression at various times, and he eventually applied for DIB.  Id.  After a hearing, an ALJ determined that Mr. Radford had lumbar degenerative disc disease and chronic obstructive pulmonary disease, but that he did not meet the criteria of Listing 1.04A.  Id. at 291-92.  The ALJ stated only that he had considered that Listing and that the "state medical examiners had also 'concluded after reviewing the evidence that no listing [was] met or equaled.'" Id. at 292 (quoting the hearing decision).  The ALJ concluded that Mr. Radford could not return

---

[1]It is not clear what is the purpose of Plaintiff's argument in this regard.  Although Listing 1.04 covers disorders of the spine resulting in compromise of either the nerve root or the spinal cord, Listing 1.04A covers nerve root compression, whereas Listing 1.04C covers lumbar spinal stenosis.  And, Plaintiff argues that her condition meets the criteria of Listing 1.04A, not Listing 1.04C.  The Genevay & Atlas article cited by Plaintiff is titled Lumbar Spinal Stenosis, and Plaintiff does not argue that the neurological signs of lumbar nerve root compression are often intermittent.  The court need not resolve this ambiguity because it would not change the outcome of this case either way.

to work as a tree trimmer, but that he could perform other work and was therefore not disabled. Id. The district court found the ALJ's determination that Mr. Radford did not meet Listing 1.04 was not supported by substantial evidence and "that the extensive medical record showed that [Mr.] Radford fell within Listing 1.04A because all of the required medical findings were present in [Mr.] Radford's extensive medical record," and the Commissioner appealed. Id.

In her Brief before the Fourth Circuit, the Commissioner argued that the signs and symptoms of Listing 1.04A "must be 'simultaneously present' 'over a period of time sufficient to establish that the impairment has lasted or can be expected to last at listing-level severity for a continuous period of at least twelve months.'" Radford, 734 F.3d at 292. At oral argument, the Commissioner apparently recognized "the novelty of [her Brief's] interpretation," somewhat modified her argument, and argued that "[t]o meet or equal Listing 1.04A, the claimant has the burden of producing evidence that his nerve root compression is characterized by sufficiently proximate (and perhaps simultaneous) medical findings of" the four criteria of Listing 1.04A. Id., 734 F.3d at 292. The Radford court stated that

> The critical durational inquiry for purposes of awarding benefits is whether the impairment has lasted or is expected to last "for a continuous period of at least 12 months." 20 C.F.R. § 404.1509 ("How long the impairment must last"). This languages mirrors the statute: The Social Security Act provides benefits for claimants with a "disability" defined as an
>> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or *which*

> *has lasted or can be expected to last for a continuous period*
> *of not less than 12 months.*

42 U.S.C. § 423(d)(1)(A) (emphasis added).  The duration requirement thus screens out claimants with impairments that have not lasted and cannot be expected to last for a continuous year or more.

Id., 734 F.3d at 293.

The court found that:

> Neither the text nor the structure of the regulation reveal [sic] an intent to layer a more stringent proximity of findings requirement on top of the durational requirement.  And that makes sense.  It would be peculiarly redundant to require that a claimant prove that his impairment will last or has lasted at least 12 months <u>and</u> that he produce medical examinations showing that each symptom in Listing 1.04A presents either simultaneously or in sufficiently close proximity such that an ALJ could conclude that the claimant's impairment will last or has lasted at least 12 months.  We reject such a redundant construction of the regulation.

Id., at 293-94.

Although the <u>Radford</u> court purported to have examined the text and the structure of the regulation, its holding ignores the purpose of the Listings (to streamline the disability determination process and to identify and provide an early disability decision for claimants whose impairment prevents the performance of any gainful work) as expressed by the Supreme Court in <u>Zebley</u>.  493 U.S. at 532-33.  The purpose of the Listings is a measure of severity, not duration.  For cases that make it to step three of the sequential evaluation process, the duration requirement has been met at step two, where it is determined that the claimant has "a severe medically determinable physical or mental impairment that meets the duration requirement . . ., or a combination of impairments that is severe and meets the duration requirement."  20 C.F.R. § 404.1520(a)(4)(ii).  Step three

merely requires that the claimant's condition meets or equals the criteria of a Listed Impairment, and that the impairment in which the criteria are met or equaled is one of the impairments which meets the duration requirement, i.e., it has lasted or is expected to last at least 12 months.  Id., at § 404.1520(a)(4)(iii) ("If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement").  Contrary to the Radford court's holding, the criteria of Listing 1.04A and the duration requirement are not redundant.  Each serves a different purpose in the evaluation of disability.  The criteria of a Listing are a measure of the severity of the claimant's impairment, whereas the duration requirement measures the longevity of the claimant's impairment.

As the Commissioner explained in AR 15-1(4), when all of the criteria of Listing 1.04A are met in one examination, that examination provides a clinical presentation severe enough to suggest "nerve root compression that is so severe that it would preclude any gainful activity," whereas "[a]n individual who shows only some of the criteria on examination presents a different, less severe clinical picture."  80 Fed. Reg. at 57,420. Although the Radford decision also found error in the Commissioner's argument presented in that case regarding a proximity-of-findings requirement, the Commissioner here makes only an argument regarding simultaneous findings.  The court need not decide how such a case should be handled because Plaintiff does not argue that his examinations revealed findings which were of sufficient proximity to demonstrate that he meets the Listing, and the parties did not brief that issue.  That may be another case for another day.

Although the court is unable to find a Tenth Circuit opinion directly on point, it believes the Circuit would adopt reasoning similar to that above.  As the Commissioner's Brief suggests, the Tenth Circuit has decided a case where the plaintiff advanced an argument identical to that advanced here--that the Plaintiff "exhibited symptoms meeting all of the criteria required by Listing 1.04A at various times."  Melendez v. Astrue, 359 F. App'x 8, 11 (10th Cir. December 16, 2009).  The court rejected Mr. Melendez's argument because the evidence from April 2001 through May 23, 2003 was not relevant, because his disorder of the spine (herniated disc) no longer existed as it was repaired by surgery in April 2002, because medical evidence supported the ALJ's finding, and because Mr. Melendez did not point to evidence contrary to the ALJ's decision.  Id.  Although the Melendez court did not hold that the criteria of Listing 1.04A must be present simultaneously, its rejection of Mr. Melendez's argument to that effect is some evidence in support of the court's holding here.

The court finds that in Shearson Lehman Bros., Inc. v. M & L Inv., 10 F.3d 1510 (10th Cir. 1993) the Tenth Circuit relied upon the policy and purpose behind a federal regulation as a deciding consideration in a context similar to this, and believes that court would also rely upon the purpose of the regulations controlling step three in a disability determination.  To set the stage, the court discusses in a very abbreviated form the facts of the case and the decision of the district court as relevant to the issues here.  Shearson Lehman Bros., Inc. v. M & L Inv., 776 F. Supp. 1489 (D. Utah 1991) aff'd in part, and rev'd in part by M & L Inv., 10 F.3d 1510.  The owner of M & L Inv., Mike Strand, was a

sophisticated participant in the over-the-counter stock market with substantial experience trading securities.  776 F. Supp. at 1491.  He had a brokerage account with Shearson.  Id. Since the account with Shearson was a "cash account," Mr Strand was required by regulations to pay for his purchases within seven days of that purchase--the settlement date.  Id.  And, if payment was not received by the settlement  date, the regulations required the broker to "promptly" cancel or otherwise liquidate the transaction.  Id. 776 F. Supp. at 1497.

Over the course of his relationship with Shearson, Mr. Strand engaged in extensive purchases of a particular stock between April 21 and at least June 27, 1986, and although he paid for a considerable amount of the stock, he got behind in his settlements, and there was considerable back and forth between him and Shearson regarding settlement.  Id. at 1491-93.  Shearson finally began to liquidate the account on July 11, 1986, seven days after the purchase date for Mr. Strand's final purchase order.  Id. at 1492.  Mr. Strand contacted Shearson, demanded they stop liquidation, and after three business days convinced them to do so when he suggested he was making arrangements for payment. Id. at 1492-93.  No payment materialized, and on August 7, 1986 Shearson filed suit in the district court seeking payment.  All of the remaining shares at issue were liquidated at a substantial loss on September 19.  Id. at 1493.  Mr. Strand counterclaimed, alleging breach of contract, arguing that Shearson's actions excused part of his failure to pay, and arguing that Shearson's failure to promptly liquidate in violation of the regulations constituted a failure to mitigate damages, and barred its recovery.  Id.

25

The court found that Shearson did not breach the contract at issue but that Mr. Strand had incurred a sizeable debt he had failed to pay. Id. at 1503. However, the court found that under New York law, Shearson failed to promptly liquidate the account in compliance with the regulations, and this failure was an affirmative defense to its suit for payment, and that the same regulation was an affirmative defense to Mr. Strand's counterclaims since he sought an illegal extension of credit. Id. at 1504. In finding that the regulations were an affirmative defense, the district court considered the regulations and the application of New York law.

The court acknowledged that federal courts, and particularly the Tenth Circuit, have long held that the regulation does not provide a private cause of action against a broker such as Shearson who has violated the regulation. 776 F. Supp. at 1499 (citing Utah St. Univ. v. Bear, Stearns & Co., 549 F.2d 164, 169-70 (10th Cir. 1977). The court next considered whether a broker's violation of the regulation might nonetheless be invoked as an affirmative defense to the broker's suit seeking damages for breach of the investment contract. Id. The court noted several cases in which various jurisdictions have held that a violation of the regulations may not be used as an affirmative defense because the purpose of the regulation was to protect the economy or the market in general. Id. at 1499-1500 (citing Bache Halsey Stuart, Inc. v. Killop, 509 F. Supp. 256 (E.D. Mich. 1980); Styner v. England, 40 Wash. App. 386, 699 P.2d 234 (1985); and Gregory-Massari, Inc. v. Purkitt, 1 Cal. App. 3d 968, 82 Cal. Rptr. 210 (1969)).

26

Despite those opinions, the court determined that it was required to apply New York law, and that the applicable law provided that Shearson's failure to promptly liquidate the account was an affirmative defense to its action for damages.  Id., 776 F. Supp 1500-02.  The district court found that the controlling law required "that mutual violations of federal securities regulations governing margin requirements will preclude both broker and client from recovery on the underlying transaction in a state law cause of action for breach of contract."  Id. at 1501 (citing Thomson McKinnon Secs., Inc. v. Hornung, 69 A.D.2d 118, 419 N.Y.S.2d 526 (1979); Berliner Handels-Und Frankfurter Bank v. Coppola, 568 N.Y.S.2d 751 (App. Div. 1991); and Jeremias v. Shearson Hayden Stone, Inc., 72 A.D. 506, 420 N.Y.S.2d 881, 882-83 (1979)).  However, the court also recognized New York case law authority allowing a broker's cause of action, but limiting the measure of damages because of the broker's violation of the regulation.  Id., 776 F. Supp. at 1502 (citing Shearson Hayden Stone, Inc. v. Feldman, 109 Misc. 2d 403, 439 N.Y.S.2d 975, 977 (Civ. Ct. 1980); and Billings Assoc., Inc. v. Bashaw, 27 A.D. 124, 276 N.Y.S.2d 446, 446 (1967)).  Because neither Feldman nor Billings were cited by subsequent cases, but Hornung had been cited favorably by a more recent appellate decision, the district court concluded that Hornung was controlling, dismissed Shearson's complaint, and found that Strand was also barred from recovering damages.  Id. at 1502 & n.16.

Both parties appealed, and on appeal the Tenth Circuit determined that Shearson had violated the regulation, and that New York law in fact applied.  10 F.3d 1513-15.  In

27

applying New York law, the appellate court noted that the <u>Hornung/Berliner</u> line of cases, and the <u>Bashaw</u> case were from different departments of the New York intermediate appellate court and that both "remain good law in New York, depending upon which department dictates a court's precedent." <u>Id.</u>, 10 F.3d 1515.  It then determined that it "must decide which rule of law New York's highest court would apply." <u>Id.</u> at 1516.  In making that determination, the Tenth Circuit looked first to the purpose of the federal regulation at issue, and found that it was "to protect the general economy from the infusion of prohibited credit," and was "to benefit the market in general, not to benefit individual investors." <u>Id.</u>  The court noted that "because the regulations place the burden of margin requirement compliance equally upon broker and client, it is inconsistent to place the entire burden of compliance upon brokers in contract disputes." <u>Id.</u>  The court concluded that "while Shearson's violation of [the regulation] might affect the amount of damages it can recover for [Mr.] Strand's alleged breach, it is not an affirmative defense to Shearson's breach of contract claim." <u>Id.</u> (citation omitted).

Because the Tenth Circuit looked primarily (almost exclusively) to the purpose of the federal regulation in deciding how New York's highest court would decide the question at issue in <u>M & L Inv.</u>, the court believes the Tenth Circuit would apply the purpose of the statutes and regulations controlling step three determination in Social Security disability cases in a similar manner as this court has done in this case.  The court finds that the Commissioner's interpretation of the regulations, and particularly Listing 1.04A is consistent with that purpose, and the Fourth Circuit's holding in <u>Radford</u> is not.

28

**D.      The ALJ in this case adequately explained why Listing 1.04A is not met or equaled.**

Plaintiff argues that she provided ample evidence that she met or equaled Listing 1.04, but that the ALJ's discussion in that regard is contradictory and ambiguous.  (Pl. Br. 12).  She argues that the ALJ "folded his step three analysis into his credibility findings," id., and the court is unable to "determine that the ALJ's findings and the medical evidence of record 'conclusively negate the possibility . . . that Claimant is presumptively disabled under' Listing 1.04" (Pl. Br. 13) (quoting Fischer-Ross, 431 F.3d at 735).

Here, the ALJ stated his step three finding:

> The claimant's back impairment does not meet the requirements of listing 1.04 Disorders of the spine because the record does not contain evidence of nerve root compression, or spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication.

(R. 14).  Plaintiff cannot seriously argue that her condition meets Listing 1.04B or Listing 1.04C because there is simply no record evidence of arachnoiditis or pseudoclaudication.

Rather, her argument is that her condition meets or equals Listing 1.04A.  Medical equivalence to a Listing may be established by showing that Plaintiff's impairment(s) "is at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. §§ 404.1526(a), 416.926(a).  The determination of medical equivalence is made without consideration of vocational factors of age, education, or work experience.  20 C.F.R. §§ 404.1526(c), 416.926(c).  It is Plaintiff's burden at step three to show that her condition is medically equivalent to a Listing, but she has not shown that her condition is

equal in severity and duration to each of the criteria of Listing 1.04A.  Therefore, she has not met her burden to show medical equivalence.

Further, she has not shown that her condition meets all of the criteria of Listing 1.04 simultaneously as the court has determined is necessary in order to meet Listing 1.04A.  In fact, she admits that her condition does not do so.  (Pl. Br. 11) (arguing that she "established all of the necessary elements of Listing 1.04—just not simultaneously").  She has admittedly not met her burden to show that her condition meets the criteria of Listing 1.04A.

The court finds no error in the ALJ's decision.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's final decision.

Dated this 24th day of May 2016, at Kansas City, Kansas.


s:/ John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**